# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF ARKANSAS
# FAYETTEVILLE DIVISION

**NUMED TECHNOLOGIES, INC.**                                                       **PLAINTIFF**

      **v.**                **Civil No. 06-5033**

**TIM R. FIDLER and FIDMED, LLC**                                   **DEFENDANTS**

## O R D E R

Now on this 31st day of March, 2006, comes on for consideration plaintiff's **Motion For Preliminary Injunction** (document #2), and from said motion, the supporting documentation, the response thereto, and the evidence and arguments at a hearing on March 30, 2006, the Court finds and orders as follows:

1. Plaintiff NuMed Technologies, Inc. ("NuMed") alleges tortious interference with its contracts and business expectancies by defendant Tim R. Fidler ("Fidler") and Fidler's limited liability company, FidMed, LLC ("FidMed"), civil conspiracy by Fidler and FidMed, and breach of contract by Fidler.

NuMed now seeks a preliminary injunction enjoining both defendants from soliciting business from NuMed's customers, competing with NuMed, and destroying any information relating to NuMed or its customers.

2. The decision as to whether a preliminary injunction should issue involves a consideration of four factors:

(a) is there a threat of irreparable harm to the moving party if an injunction does not issue?

(b) what is the balance between this harm, and the injury

that granting an injunction would inflict on the other litigants?

(c) what is the probability that the moving party will succeed on the merits of its claim?

(d) what is the public interest in the matter?

**Dataphase Systems, Inc. v. CL Systems, Inc.**, **640 F.2d 109 (8th Cir. 1981)**. This is not a wooden, mathematical inquiry, but rather a fact-specific inquiry to determine whether "the balance of the equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.*, **640 at 113**.

3. In order to provide a factual background for the Court's analysis, the Court will recite its understanding of facts which do not now appear to be in dispute between the parties:

NuMed is an independent manufacturer's representative for Medtronic Sofamor Danek, Inc. ("MSD"), a manufacturer of spinal implant devices. Its customers are hospitals, surgical centers, and surgeons in Arkansas, Kansas, Missouri and Oklahoma. It has a cadre of sales representatives assigned to various sales territories in these areas.

Fidler was employed as a sales rep for NuMed until June 3, 2005, when he e-mailed the president of the company a letter of resignation. He formed FidMed later that year, and is currently a sales rep for FidMed. FidMed sells spinal implant devices for Abbott Spine.

When Fidler was hired by NuMed, he signed an Employment Agreement which, among other things, purported to define the area in which he would be permitted to work as a sales rep for NuMed's products. The Employment Agreement contained a series of provisions purportedly restricting Fidler from soliciting NuMed's customers and competing with NuMed for twelve months after termination of his employment.

NuMed now contends that, after Fidler resigned on June 3, 2005, he violated the non-compete provisions of the Employment Agreement by selling devices similar to those marketed by NuMed to customers in the area covered by the Employment Agreement.

4. In support of its motion, NuMed called two witnesses to testify: Richard Cranford ("Cranford") and Fidler. The Court will not attempt to set out in full all the testimony and other evidence presented at the hearing but, rather, will set forth only that which it deems necessary for it to decide the issue currently before it.

(a) Cranford, the founder and sole stockholder of NuMed, testified, *inter alia*:

* that his company serves a niche market of surgeons who perform spinal surgery;

* that his sales reps become privy to a great deal of confidential and proprietary information about the products they sell; about NuMed's clientele and their idiosyncrasies; and about

NuMed's business and marketing strategies;

*   that NuMed's business is very "relationship oriented" and that sales reps make demonstrations of the implants, answer questions, and are present in the operating room to render technical assistance when surgeons are implanting their products;

*   that after Fidler resigned it came to Cranford's attention that Fidler had apparently been seen making a sales presentation to several doctors in the Little Rock area;

*   that Cranford caused letters to be sent to Fidler from NuMed's attorney on July 1, 2005, and July 6, 2005, reminding Fidler of the provisions of the Employment Agreement, and the second of these letters asserted that Fidler was in breach of the contract, and that NuMed contemplated immediate legal action;

*   that, notwithstanding the letters to Fidler, no action was taken at that time because Cranford had no specific evidence that Fidler was, in fact, competing in violation of the Employment Agreement;

*   that in October, 2005, one of NuMed's sales reps told Cranford he had seen Fidler preparing for surgery with a NuMed client; a few weeks later, a NuMed sales rep saw Fidler's card and a sales brochure that had been left with a NuMed client;

*   that, notwithstanding having received the foregoing reports in October, NuMed still did not file suit until February 23, 2006;

*   that the pending motion for preliminary injunction was filed on March 6, 2006;

*   that Fidler's conduct is taking sales revenue away from NuMed, and has been "incredibly detrimental to business";

*   that there is no way to quantify NuMed's business loss occasioned by Fidler's conduct;

*   that Fidler's conduct is damaging NuMed's business relationships with its customers, and that Fidler's attempts to make sales to NuMed's customers is "uncomfortable."

(b) Fidler testified in part as follows:

*   that, when departing from employment with NuMed, he had assured Cranford he would not "break my non-compete";

*   that, when signing his employment contract with Abbott Spine, he had specifically exempted from the scope of his sales efforts thereunder the customers and locations which defined the area of his responsibility when employed by NuMed under the Employment Agreement;

*   that he is, in fact, selling for Abbott Spine devices similar to those he sold for NuMed; and

*   that, since leaving NuMed, he had not called upon or otherwise solicited any of NuMed's customers in the areas defined by his Employment Agreement with NuMed.

5.  The Court will now address NuMed's request for a preliminary injunction in light of this evidence and the

-5-

applicable **Dataphase** criteria.

(a) <u>Irreparable Harm</u> - In evaluating Cranford's testimony, the Court is obliged to conclude that he testified essentially in terms of conclusions and generalities. He did not identify any NuMed customer who had complained about Fidler trying to sell it Abbott Spine products. He did not mention any NuMed customer who had taken its business elsewhere because of Fidler's conduct. He did not testify that MDS, his sole supplier, had indicated concerns over what Fidler might be doing. He did opine that NuMed had an obligation to protect itself and its obligations to MDS in that respect, but offered no proof that any problem had yet developed. Cranford did not indicate there had been a drop in revenue or billings for any month since Fidler left NuMed - much less attribute such to Fidler's departure and/or subsequent activities. He did not, in fact, describe any specific business loss.

Cranford's explanation as to why he delayed filing suit and seeking injunctive relief from July, 2005, until March, 2006, was not compelling - especially in light of the fact that the "lion's share" (approximately nine months) of the time during which such relief might be useful to NuMed had already expired by the latter date and that any such relief could only apply until June 3, 2006. The Court is thus presented with a claim that irreparable damage is being done, made by a party who took no action to stop it until

three months before expiration of the twelve-month period in which that damage might have been prevented.

The Court is also not persuaded that reference to provisions in the Employment Agreement make up deficiencies in NuMed's proof on this issue.

Although Fidler said he didn't read the Employment Agreement in full before signing it, he did sign it and, among other things, it contains provisions to the effect:

\*   that soliciting NuMed's customers would constitute "tortious interference with contract and tortious interference with a business relationship";

\*   that such competition would be "intrinsically unfair" to NuMed and would "cause undue hardship" to NuMed; and

\*   that, in the event of breach or threatened breach of the Employment Agreement, the "prevailing party" would be entitled to injunctive relief.

While the first two provisions support the notion that a breach of the Employment Agreement would justify compensatory damages, they do not establish the proposition that such breaches would cause irreparable harm for which money damages could not compensate. As to the third, it remains to be seen who will be the "prevailing party" in this case after a plenary hearing.

In sum, therefore, Court does not believe the foregoing testimony and proof is sufficient to establish that irreparable

harm is being suffered by NuMed.

(b) <u>Other Dataphase criteria</u> - In view of the Court's conclusion as to irreparable harm, it is not necessary to dwell at length on the remaining Dataphase criteria. The Court, will, therefore simply make the following observations:

(1) <u>Balance of Harms</u> - Weighed against the possibility of harm to NuMed as asserted by Cranford's testimony, is Fidler's testimony wherein he points out that the Employment Agreement, if enforced as sought by NuMed, would probably cost him his job as an Abbott Spine distributor. He admits that he could make a living in some other field of sales, however, and the Court finds the balance of harms to be about equal.

(e) <u>The probability of success on the merits</u> - The Employment Agreement which contains the covenant not to compete provides that it "shall be interpreted and construed under and governed by the laws of the State of Tennessee, exclusive of its choice of law provisions." The Tennessee Supreme Court has summarized Tennessee law on covenants not to compete as follows:

> In general, covenants not to compete are disfavored in Tennessee. These covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the employee. However, if there is a legitimate business interest to be protected and the time and territorial limitations are reasonable then non-compete agreements are enforceable. Factors relevant to whether a covenant is reasonable include: (1) the consideration supporting the covenant; (2) the threatened danger to the employer if the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to

> the public interest. Also, the time and territorial
> limits must be no greater than necessary to protect the
> business interest of the employer.

**Murfreesboro Medical Clinic, P.A. v. Udom, 166 S.W.3d 674 (Tenn. 2005)** (internal citations and quotation marks omitted).

Evaluation of the reasonableness of time and territorial limits must be made on an ad hoc basis, seeking to determine in each case "what is necessary for the protection of the promisee's rights and is not injurious to the public." **Baker v. Hooper, 50 S.W.3d 463, 469 (Tenn.Ct.App. 2001),** citing **Williston on Contracts**.

Under these criteria, the Court is not persuaded that NuMed enjoys a high probability of success on the merits even if it had been able to convince the Court that it was exposed to irreparable harm. It appears from the presentations that NuMed seeks to prevent Fidler from competing not only in his territory as defined by the Employment Agreement, but also in areas where NuMed does not even have any accounts. It also appears that, if strictly construed, the Employment Agreement might serve to prevent Fidler from soliciting not only NuMed's established customers - but also its potential future customers - and from competing with regard to any product produced by MSD's parent company Medtronic. The parties seem to agree that Medtronic is one of the largest purveyors of medical devices in the world, with a range of products much broader than the narrow spinal implant niche in

-9-

which Fidler worked.

Given the breadth of the Protective Covenants of the Employment Agreement, the Court could not opine that there is a probability of success on the merits weighing in NuMed's favor.

(3) <u>The public interest</u> - The Court finds the public interest in enforcing valid contracts about equally balanced with the public interest in avoiding unnecessary restraints on trade and, thus, this factor could not be said to weigh in NuMed's favor on the issue.

6. The Court concludes that, weighing all the foregoing factors together, it is not persuaded that the balance of the equities so favors NuMed that justice requires the Court to intervene to preserve the status quo until the merits of this dispute are determined.

The motion for preliminary injunction will, therefore, be denied. The parties are cautioned, however, that this is a preliminary disposition, and in no way will dictate the Court's conclusion when the evidence has been fully developed and presented at a plenary trial of the issues.

**IT IS THEREFORE ORDERED** that plaintiff's **Motion For Preliminary Injunction** (document #2) is **denied.**

**IT IS SO ORDERED.**

                                        **/s/ Jimm Larry Hendren**
                                        **JIMM LARRY HENDREN**
                                        **UNITED STATES DISTRICT JUDGE**